UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

YOLANDA L. DAVIS,

                      Plaintiff,                 Civil Action No.: 12-cv-14862
                                                  Honorable Victoria A. Roberts
              v.                   Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                      Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 13]

Plaintiff Yolanda Davis brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, [11, 13], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [4].

**I.**     **RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge ("ALJ") erred in failing to consider the opinion of a consulting physician. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [13] be DENIED, Davis's motion [11] be GRANTED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be REMANDED for further proceedings consistent with this Report and Recommendation.

## II.     REPORT

### A.     Procedural History

On January 19, 2010, Davis filed applications for DIB and SSI, alleging disability as of October 3, 2008. (Tr. 110-117). Both claims were denied initially on May 3, 2010. (Tr. 54-62). Thereafter, Davis filed a timely request for an administrative hearing, which was held on May 10, 2011, before ALJ Theodore Grippo. (Tr. 10-32). Davis, represented by attorney Kenneth Laritz, testified, as did vocational expert ("VE") William Newman. (*Id.*). On August 20, 2011, the ALJ found Davis not disabled. (Tr. 35-53). On October 25, 2012, the Appeals Council denied review. (Tr. 1-6). Davis filed for judicial review of the final decision on November 1, 2012. [1].

### B.     Background

#### 1.     Disability Reports

In a January 19, 2010 disability field office report, the interviewer noted that although Davis alleged an onset date of October 3, 2008, a potential onset date might be January 6, 2010, coinciding with the date of her application. (Tr. 133). The interviewer also noted a prior initial denial of benefits dated July 1, 2009. (Tr. 134). During the interview, Davis was not noted as having any difficulties, except that she "stretched her back a few times." (Tr. 135).

In an undated adult disability report, Davis reported that the conditions preventing her from working are manic depression, suicidal thoughts, bipolar disorder, and back pain. (Tr. 138). She reported that she stopped working in October 2009 due to her condition. (*Id.*). She takes Flexeril and hydrocodone for her back pain, Prozac, Seroquel, Valium and Zoloft for her mental conditions and Cymbalta for "unk[nown]" reasons. (Tr. 141). She treats with a primary physician and a psychologist, and reported trips to the emergency room for both her physical and

mental conditions.  (Tr. 142-44).

In a February 10, 2010 adult function report, Davis reported living in an apartment with her daughter, who helps care for her.  (Tr. 147-154).  Davis reported receiving help from family members with personal care, cooking, cleaning and shopping, due to her back pain and depression.  (*Id.*).  She is capable of sitting down to make a sandwich, but is incapable of housework, yard work or shopping.  (Tr. 148-50).  She can ride in a car but cannot go out alone due to her conditions.  (Tr. 150).  Her mother or her daughter generally shop for her because she cannot "lift anything heavy" or "stand in line."  (*Id.*).  Davis reported mainly staying home and watching television or playing games with her family.  (Tr. 151).  She goes out only for doctor appointments.  (*Id.*).  Davis reported that her conditions interfere with her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions and get along with others.  (Tr. 152).  She reported being able to walk the distance between her bed and the bathroom "sometimes," lifting less than 10 pounds, and paying attention for "a minut[e]."  (*Id.*).  She sometimes needs help following instructions and dealing with authority figures, and she does not handle stress or changes in her routine very well.  (Tr. 152-53).  Davis reported that she experiences feelings of wanting to hurt others andthoughts of suicide.  (Tr. 153).

In a February 15, 2010 third-party function report, Davis's mother-in-law Paulette Butler corroborated most of Davis's reported impairments, although Butler attributed Davis's inability to perform most of her activities of daily living to her anger and mental disorder, as opposed to her physical pain.  (Tr. 164-171); (*See e.g.* Tr. 166: Davis does not cook because she is "never in the mood."); (Tr. 167: Davis does not do yard work due to her mental conditions).  However, Butler did repeatedly cite Davis's back pain as a major impediment to her ability to carry out

3

daily activities, including cooking, dressing, bathing, using the toilet, and shopping.  (Tr. 166-70).  Butler noted that Davis often gets angry about "crazy stuff" and that she keeps her away from the kitchen because she needs "to stay away from kni[v]es."  (Tr. 166).  Butler also reported that Davis suffers from auditory hallucinations.  (Tr. 170).  Butler reported that Davis spends most of her time in bed away from others, and that Butler will take care of her and Davis's daughter.  (Tr. 164-171).

In an undated disability appeals report, Davis reported that her back and leg pain had worsened beginning in approximately 2010.  (Tr. 172).  She reported performing "all activities at a very slow pace for short periods of time."  (Tr. 174).  She reported no additional medical treatment for her conditions.  (Tr. 172-74).

## 2.    *Plaintiff's Testimony*

At the hearing, Davis testified that she completed ninth grade and previously worked as a press operator and in child care.  (Tr. 17-18).  She applied for disability due to back pain and depression.  (Tr. 18).  She also testified to long-standing neck pain that had increased in severity in late 2010.  (*Id.*).  She receives monthly treatment for her depression, and takes Valium, Vivactil and Seroquel.  (Tr. 19).  Despite this treatment, Davis testified that she still has depressed periods, crying spells and an inability to remember things.  (Tr. 19-20).  Her crying spells last approximately 20 minutes until someone calms her down.  (Tr. 20).  She also testified to angry outbursts.  (Tr. 25).

Davis testified to lower back pain that radiates to her legs.  (*Id.*).  She testified that she has arthritis in her left leg and a possible bone chip in her right.  (*Id.*).  She has difficulty going up stairs.  (*Id.*).  Davis also testified to neck pain that radiates to her left arm and hand and prevents her from turning her head in any direction.  (Tr. 20; 26).  She takes Vicodin, Neurontin

4

and Naproxen for pain.  (Tr. 22).  She also testified to having an injection in her neck and another scheduled, and that she wears a neck brace.  (Tr. 21; 23).  Her doctor has recommended surgery if the injections do not help.  (Tr. 21).

Davis testified that her medications cause her dizziness and drowsiness, rendering her unable to drive.  (Tr. 22; 24).  She also has to lie down at various points in the day due to pain. (Tr. 22).  She is able to sit no longer than 30 minutes and stand for only a few minutes before the pain makes it intolerable.  (Tr. 23).  She can lift no more than 10 pounds, cannot sit in a car to go places and does not sleep through the night due to pain.  (Tr. 24).  Her daughter helps her by ensuring she takes her medications, cooking for her, and helping with personal care.  (Tr. 25).

     3.  *Medical Evidence*

       a.  *Treating Sources*

         i.  *Lower Back Pain*

According to the medical records, Davis began complaining of lower back pain to her primary care physician, Dr. Nwanneka Odumodu, at an appointment on September 8, 2009.  (Tr. 269).  While the majority of Dr. Odumodu's treatment notes are illegible, it appears that upon examination, he noted back spasms and a decrease in function, as well as tenderness in Davis's lumbar spine.  (*Id.*).  He diagnosed back pain and prescribed Flexeril.  (*Id.*).  Davis continued to complain of back pain and parasthesia in her left leg at follow-up appointments on November 6 and 30, 2009.  (Tr. 267-68).  Tenderness of her lumbar spine was noted on examination at both appointments.  (*Id.*).  Although noting that x-rays were negative, Dr. Odumodu ordered an MRI of Davis's lumbar spine.  (*Id.*).  An MRI taken on November 12, 2009, showed mild degenerative changes and minimal to mild diffuse disc bulging at L2-L3 and at L5-S1.  (Tr. 283-84).  Dr. Odumodu may have also managed Davis's medication at these appointments, but his

notes are illegible. (Tr. 267-68). Davis continued to complain of back pain, but no parasthesis, at appointments on December 30, 2009, and January 29, 2010. (Tr. 265-66). At these appointments, Dr. Odumodu noted tenderness of her lumbar spine and spasms. (*Id.*). He appears to have increased her Valium dosage and ordered physical therapy. (Tr. 265).[1] There are no further treatment notes from Dr. Odumodu relating to lower back pain. However, fifteen months later, on April 28, 2011, the doctor completed a medical source statement for Davis, diagnosing her with neck and back pain. (Tr. 359-60). As a result of these conditions, he limited her to lifting less than 10 pounds occasionally, and standing, walking and sitting only for 30 minutes each out of an eight-hour day.

## ii.    Neck Pain

Although at various points in the record Davis alleges that her neck pain was long-standing, getting worse in late 2010, (*See* Tr. 18; 366; 382), the first objective medical evidence of this pain is found in discharge notes from an emergency room visit on April 26, 2011, where Davis was diagnosed with cervical radiculopathy. (Tr. 355). Because the record contains only one page of these ER records, it is impossible to tell the origin of this pain or the reason Davis visited the emergency room on this date. (*Id.*). Davis was treated in the emergency room again on April 30, 2011, for cervical radiculopathy. (Tr. 364). Again only a one-page discharge note is found in the record, which does not indicate the origin of this pain or give a description of the doctor's findings. (*Id.*). However, the instructions do note that a cervical collar was prescribed, as well as Naprosyn, Valium, Vicodin, Prednisone and Neurontin, and that Davis should "follow up with neurosurgery if not better." (*Id.*). As noted above, Davis's primary physician Dr.

---

[1] In one of Davis's psychiatric treatment records from March 2010 there is a reference to her injuring her back falling down stairs and that she was going to physical therapy, but there are no treatment records in the file to accompany this report. (*See* Tr. 304).

Odumodu completed a medical source statement on April 28, 2011, diagnosing Davis with neck and back pain.[2]  (Tr. 359-60).  As a result of these conditions, he limited her to lifting less than 10 pounds occasionally, and standing, walking and sitting only for 30 minutes each out of an eight-hour day.  (*Id.*).  He subsequently ordered an MRI of her cervical spine on May 2, 2011, which showed

> [m]ultilevel discogenic changes . . . which are most conspicuous at the C5-C6 [ ] and C6-C7 level.  There are right and left posterolateral disc protrusions at the C5-C6 level with resultant cord flattening, increased cord signal and moderate bilateral foraminal encroachment.  Additionally there is a large left posterolateral disc protrusion with inferior extrusion at the C6-C7 level which results in cord flattening, increased cord signal and mass-effect upon the existing left C7 nerve root.

(Tr. 362-63).  Evidence submitted to the Appeals Council revealed that Davis underwent surgery for her cervical radiculopathy in March 2012.  (Tr. 381-83).

### iii.     Depression

According to treatment records, Davis first presented to her primary care physician, Dr. Odumodu, with symptoms of depression on October 29, 2007.  (Tr. 282).  At that time she reported feeling "stressed out" and that she was "not gaining weight."  (*Id.*).  She did not have any suicidal thoughts.  (*Id.*).  Dr. Odumodu prescribed Paxil.  (*Id.*).  At a follow-up on November 5, 2007, Davis reported feeling "dazed" on Paxil, and continued to report feeling "overwhelmed" and "stressed" to the point she was "not eating," could not sleep and was losing weight.  (Tr. 281).  While the majority of Dr. Odumodu's treatment notes from this visit are illegible, it appears he discontinued Paxil and prescribed Zoloft.  (*Id.*).  At a follow-up on January 30, 2008, Davis reported benefiting from the Zoloft, in that she was going out more and sleeping better.

---

[2] Although Dr. Odumodu diagnosed Davis with neck pain in his medical source statement, there are no treatment records from Dr. Odumodu related to Davis's neck pain.  It does appear however that he did treat her at some point because he ordered a cervical MRI on May 2, 2011. (Tr. 362-63).

(Tr. 280).  She denied any suicidal thoughts.  (*Id*.).  Dr. Odumodu increased her Zoloft dosage.  (*Id*.).  Davis continued to note improvement at follow-up appointments on February 7, March 11, and March 21, 2008, including an increased appetite, energy and activity level, and improved sleep.  (Tr. 276; 277-79).  Davis was seen again approximately six months later on September 4, 2008, where she reported increased depression secondary to stresses in her home life, including the fact that her boyfriend recently got out of jail, she was having financial troubles and she was moving.  (Tr. 275).  She denied any suicidal ideations.  (*Id*.).  Dr. Odumodu managed her medication and recommended therapy.  (*Id*.).

Davis presented to a therapist at the Eastwood Clinic on October 28, 2008.  (Tr. 252-57).  She reported increased depression and isolation, crying spells, and decreased appetite and sleep.  (Tr. 252; 256-57).  She also reported hearing voices telling her to harm herself when she is frustrated.  (Tr. 252).  She reported no suicidal ideation, however.  (*Id*.).  She reported having issues with depression since the age of 14 due to a stressful home life.  (*Id*.).  Upon examination, Davis was noted to be well groomed with fair mood and tearful affect.  (*Id*.).  She was oriented times three and her perceptions and thought processes were intact.  (*Id*.).  She had average intelligence and fair judgment, insight, impulse control and motivation.  (*Id*.).  She was diagnosed with a major depressive disorder and issued a Global Assessment of Functioning ("GAF") score of 45.  (Tr. 254).  She was to begin weekly outpatient treatment on December 4, 2008.  (*Id*.; Tr. 257).

Davis was admitted to the emergency room on November 2, 2008, with suicidal and homicidal ideations, and a homicidal attempt after having drawn a knife on her husband.  (Tr. 217-32).  She also reported considering overdosing on pills to take her own life.  (Tr. 221).  Davis reported that her breakdown was the result of multiple life stressors, including raising a

special needs child, losing her income, losing her low-income housing voucher and her husband losing his income. (Tr. 223). She also reported that her husband suffers from emotional problems that were affecting their marriage and for which he was seeking counseling. (*Id.*). Davis reported suffering from panic attacks and auditory hallucinations telling her to kill herself. (*Id.*). She became hysterical, foaming at the mouth and hyperventilating, and ultimately attempted to stab her husband with a knife. (*Id.*). She was diagnosed with major depressive disorder with psychosis and admitted for inpatient treatment. (Tr. 222-23). Upon examination, she was oriented times three and her judgment and insight were fair. (Tr. 225). She denied any current suicidal or homicidal ideation or any hallucinations. (*Id.*). She reported becoming aggressive when she is emotionally upset, which led to her attempted assault on her husband with a knife, but that she was now calm and cooperative and intending on continuing with her outpatient treatment. (*Id.*). She was given inpatient treatment for two days and discharged per her request with instructions to continue with outpatient therapy and comply with medications. (Tr. 226-27). Her Zoloft was discontinued due to reports that it was not helping, and she was started on Cymbalta. (Tr. 227). At discharge she was assessed a GAF score of 35-40 and a fair prognosis. (*Id.*).

Davis began outpatient treatment again with the Eastwood Clinic on February 7, 2009. (Tr. 250-51). She reported her gap in treatment was due to a loss of insurance. (Tr. 250). She was scheduled for bi-weekly therapy sessions and a psychiatric evaluation. (*Id.*). The psychiatric evaluation, conducted on March 20, 2009, revealed a diagnosis of major depressive disorder with psychosis and marijuana abuse and Davis was issued a GAF score of 40. (Tr. 261-64). Her Zoloft was discontinued and she was prescribed Prozac and Seroquel. (Tr. 261). At a medication review appointment on May 15, 2009, Davis reported that the Prozac was helping

9

although she still heard voices, which caused her to break glasses in her house.  She also reported that the Seroquel stopped working and she started taking two pills to help her sleep better.  (Tr. 260).  The doctor increased both medications.  (*Id.*).  At a follow-up on July 14, 2009, Davis reported improvement with medication, and no suicidal ideation, although she did have an incident of auditory hallucination that caused her to break a window.  (Tr. 259).  The doctor increased her Seroqual dosage.  (*Id.*).[3]

Davis was not seen again for medication management until January 15, 2010, due to an apparent miscommunication in scheduling, although the notes state she continued therapy.  (Tr. 258).[4]  She reported continued anger, frequently getting into arguments with others.  (*Id.*).  The doctor assessed major mood disorder and to rule out bipolar disorder.  (*Id.*).  He increased her Seroquel dosage "to control behavior."  (*Id.*).  At a treatment plan review on February 6, 2010, Davis continued reporting anger, depressed mood and increased mood swings.  (Tr. 302-303).  She reported an inability to cope with stress relating to her daughter and her health problems, including limitations due to her back pain.  (Tr. 302).  She reported no suicidal ideation.  (Tr. 303).  The doctor decreased her treatment plan to monthly therapy.  (Tr. 302).

Subsequent treatment review plans spanning from May 2010 to February 2011 show some improvement in Davis's condition, although she continued to report anger issues, mood swings and crying spells.  (Tr. 341; 345-46; 348-49; 351-52).  She reported attempts to cope with anger outbursts, but she had trouble implementing appropriate coping strategies.  (*See e.g.* Tr. 345 – Davis had "uncontrollable" anger outbursts and "thoughts of wanting to hurt [her]self" but

---

[3] During this same period of time, Davis was also reporting depression to Dr. Odumodu, although it appears he deferred to the treatment plan of her psychiatrist.  (Tr. 265-74).

[4] Although it appears from the medication management notes that Davis was regularly attending therapy sessions, there are no treatment notes from these sessions in the record.

"no action taken"; Tr. 351 – patient "not yet able to apply coping strategies."). Medication review notes from this same period reveal Davis ultimately being diagnosed with bipolar disorder rather than major depressive disorder. (Tr. 304; 342-44; 347; 350; 353). They also reveal multiple medication changes (from Prozac to Topomax, to Wellbutrin, to Vivactil) in an attempt to control Davis's moods without making her sick (a reported side effect of some of her medications). (*Id.*). At her last medication management appointment of record, on February 17, 2011, Davis reported that the Vivactil was working and she was less depressed and had no suicidal ideations. (Tr. 353). However, she continued to report chest pains when she is "worked up," and that she had recently been treated at the emergency room for these pains. (*Id.*).

On April 26, 2011, therapist Anita Rogers, who had worked with Davis and had authored her treatment plan reviews over the course of her mental health treatment, completed a medical source statement. (Tr. 357-58). Although Davis's medication review notes showed that she had been diagnosed with bipolar disorder, Rogers's statement diagnosed Davis with major depressive disorder. (Tr. 357). She found that Davis had been unable to work for one year due to her condition and noted that she "is currently on medication for her mood disorder" and "has regular[ly] scheduled appointments with therapist and state psychiatrist." (Tr. 358).

### b.    *Consultative and Non-Examining Sources*

### i.    *Lower Back Pain*

Davis underwent a consultative physical examination on April 24, 2010, with Dr. E. Montasir. (Tr. 323-30). Upon examination, the doctor found that excursion of Davis's lumbosacral spine was reduced, but that there was no subluxation, contracture or instability, nor any sensory or motor reflex abnormalities. (Tr. 324). Her gait was normal, and she ambulated well without an aid. (Tr. 325). She could squat 50% of the distance, get on and off the exam

table without difficulty, and her straight leg raising test was limited to 60 degrees. (Tr. 324-25). Based on this examination, Dr. Montasir assigned no physical limitations to Davis's ability to work. (Tr. 325).

At a neurological consultative examination on June 3, 2011, (ordered by the ALJ at the hearing to evaluate Davis's cervical radiculopathy), the doctor found normal muscle strength and reflexes in Davis's lower extremities, and her range of motion in her lumbar spine was full. (Tr. 367; 369). Davis could also heel, toe and tandem walk, and a straight leg raising test was negative. (Tr. 367). X-rays taken at this consultation showed only "[g]rade I retrospondylolisthesis involving L2 on L3." (Tr. 368). The doctor issued no limitations as a result of Davis's lower back pain. (Tr. 367; 371; 373; 378).

Based on a review of the records, on May 3, 2010, a single decision-maker issued a residual functional capacity assessment ("RFC"), finding Davis capable of lifting 50 pounds occasionally and 25 frequently, sitting, standing and walking six hours each in an eight-day, and no limitations on pushing and pulling. (Tr. 333). Davis was found to occasionally be able to climb ramps and stairs, frequently balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes or scaffolds. (Tr. 334).

ii.     *Neck Pain*

At the consultative physical examination with Dr. Montasir on April 24, 2010, although the focus was at the time on her lower back, Davis was noted as having full grip strength in both hands (it appears, however, that in testing she had a Jamar Grip Strength of 40 in her right hand and only 20 in her left) (Tr. 330), her fine and gross dexterity was intact and there was no atrophy or sensory changes. (Tr. 324). Phalen and Tinel signs were negative. (*Id.*). Range of motion in Davis's cervical spine was normal. (Tr. 326). Dr. Montasir issued no limitations on

12

pulling, pushing, lifting or carrying.  (Tr. 325).

Per a request from the ALJ during the administrative hearing due to the significant MRI findings noted above, (Tr. 25-26; 362-63), on June 3, 2011, Davis underwent a consultative neurological examination for her cervical radiculopathy with neurologist Dr. R. Qadir.  (Tr. 366-79).  Davis reported that her neck pain began in December 2010 and included radiculopathy to her left arm and hand.  (Tr. 366).  Upon exam, Dr. Qadir found slightly decreased muscle strength, mild atrophy and decreased reflexes in Davis's left arm as compared to her right.  (Tr. 367).  He was unable to perform a grip strength test on her left hand "because of the pain."  (Tr. 366).  Dr. Qadir concluded that Davis would "need surgery" for her cervical radiculopathy as diagnosed by the recent MRI findings and that "without [surgery], the patient has difficulty using the left arm on a regular basis, lifting, bending or doing any strenuous activity."  (Tr. 367).  X-rays taken at this examination revealed "50% disc space narrowing of the C5-6 and C6-7 level without evidence of acute fracture or dislocation deformity identified."  (Tr. 368).

Dr. Qadir found Davis capable of performing all activities of daily living, (Tr. 371; 378), but upon completion of a medical source statement, he limited her to only lifting and carrying up to 10 pounds frequently and 20 pounds occasionally.  (Tr. 373).  He also limited her to frequent reaching, handling, fingering, feeling and pushing/pulling with her right arm, but only occasional use of her left.  (Tr. 375).  She could occasionally climb stairs, ramps, ladders or scaffolds, and occasionally balance, but he found she could never stoop, kneel, crouch or crawl.  (Tr. 376).  She could also only occasionally work around unprotected heights, moving machinery, humidity, dust, odors, extreme cold or heat or vibrations and could only occasionally operate a motor vehicle.  (Tr. 377).  He found no limitation in Davis's ability to sit, stand or walk.  (Tr. 374).[5]

_____

[5] Subsequent to the ALJ's decision, on March 7, 2012, Davis underwent surgery for her cervical

### iii.    Depression

Davis underwent a mental consultative examination on June 3, 2009.  (Tr. 245-48).  She reported being diagnosed with bipolar disorder with psychotic symptoms and having auditory hallucinations.  (Tr. 245).  She also reported having visual hallucinations and having recurrent suicidal ideations.  (*Id.*).  She reported no significant disturbance of sleep or appetite.  (Tr. 246). She denied needing assistance with activities of daily living and stated that she does go shopping with her daughter, but relies on others for transportation.  (*Id.*).

Upon examination, Davis was found to be "cooperative and intentionally ignorant."  (*Id.*). The doctor noted that while she had previously been able to recount her history in detail and fill out written portions of that history, when tested she was unable to read simple two and three letter words and could not do simple math equations or identify shapes correctly.  (*Id.*).  Her ultimate performance on the test "place[d] her in the moderately mentally retarded range of the intellectual functioning with very low first grade reading skills."  (Tr. 247).  However, the doctor found that Davis "was malingering and had probable falsification of her responses" and that the "testing was not consistent with previous testing."  (*Id.*).  He found insufficient evidence to give a definitive diagnosis other than describing her as "evidencing a mood disorder with depressed symptoms and a learning impairment."  (*Id.*).  The doctor issued Davis a GAF score of 45-50 and a guarded prognosis.  (Tr. 248).

A psychiatric review technique form was completed by Dr. Kathy Morrow on April 8, 2010.  (Tr. 305-322).  She assessed Davis with an affective disorder, specifically major depressive disorder, a personality disorder not otherwise specified and a substance abuse disorder.  (Tr. 305; 308; 312).  Based on a review of the records, she determined that Davis had

radiculopathy, resulting in a multi-level discectomy and fusion with the placement of hardware. (Tr. 381-82).  These records were submitted initially to the Appeals Council.  (Tr. 380).

14

moderate restrictions in activities of daily living, mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation.  (Tr. 315).  Dr. Morrow specifically found Davis moderately limited in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, make simple work-related decision, complete a normal work-day and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and set realistic goals or make plans independently of others.  (Tr. 319-20).  Ultimately, Dr. Morrow found Davis "retain[ed] the mental capacity to sustain an independent routine of simple work activity, . . .  tolerate low stress social demands and adapt to simple changes in routine."  (Tr. 321).

### 4.     Vocational Expert's Testimony

VE Newman testified at the hearing that Davis's past work in childcare was semi-skilled and medium in exertion.  (Tr. 29).  Her work as a press operator was unskilled medium.  (*Id.*).  The ALJ then asked the VE to assume a hypothetical claimant of Davis's age, education and vocational background who is capable of performing medium work with the following restrictions:  "She can never climb ladders, ropes or scaffolds.  She can occasionally climb ramps and stairs.  She can frequently balance, stoop, kneel, crouch and crawl.  Mentally, the individual is capable of performing simple work with low-stress social demands and simple changes of routine."  (Tr. 29-30).  The ALJ then asked the VE if such an individual could perform any of Davis's past work.  (Tr. 30).  The VE testified that such a person could perform the job of press operator.  (*Id.*).  The ALJ then added a restriction of no lifting above five pounds, unable to move head in any direction and the need to lie down at least once a day, unscheduled, due to pain.

15

(*Id.*).  The VE testified that these restrictions would preclude all work.  (*Id.*).  Davis's counsel asked the VE about allowable absences, and the VE testified that employers allow no more than one day a month.  (Tr. 30-31).  The VE testified that his testimony was consistent with the Dictionary of Occupational Titles.  (Tr. 31).

### C.      Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

16

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Davis not disabled. At Step One, he determined that she had not engaged in substantial gainful activity since her alleged onset date. (Tr. 40). At Step Two he found the following severe impairments. "disorder of the cervical spine and affective disorder." (*Id.*). At Step Three, the ALJ concluded that none of Davis's impairments, either alone or in combination, met or medically equaled a listed impairment, specifically evaluating her cervical spine disorder under Listing 1.04A and finding that although there was evidence of degenerative changes including the compromise of a nerve root, there was no evidence that this condition was "characterized by motor loss accompanied by sensory or reflex loss" as required by that listing. (Tr. 41). At this step he also found that, with regard to her affective disorder, Davis suffered from moderate restrictions in activities of daily living, mild difficulties in social functioning and moderate difficulties in concentration, persistence and pace, with no episodes of decompensation of extended duration. (Tr. 41-42). Next the ALJ assessed Davis's RFC, finding her capable of

> Medium work . . . except: claimant must never climb ladders, ropes, or scaffolds, claimant is limited to occasional climbing of ramps or stairs; claimant is limited to frequent balancing, stooping, kneeling, crouching, and crawling; and, claimant is limited to simple work with low stress social demands and simple changes in routine.

(Tr. 43).  He assessed no limitations based on Davis's cervical spine disorder, finding that "[t]he record does not contain any findings that clinically correlate the MRI scan of the cervical spine such that any functional limitations can properly be assessed due to chronic neck pain."  (Tr. 45).  In making this finding, the ALJ did not discuss or even mention Dr. Qadir's consultative examination that he himself had ordered at the close of the administrative hearing.  The ALJ concluded his opinion by finding, at Step Four, and with the aid of VE testimony, that even accounting for the above limitations, Davis could return to her past relevant work as a press operator.  (Tr. 48).  Thus, she was not disabled.  (*Id.*).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide

18

questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

Davis makes two arguments: (1) that the ALJ erred in failing to consider the consultative examination of Dr. Qadir that he himself ordered, both when assessing Davis's cervical spine disorder against a listing and when formulating his RFC, and (2) failing to properly evaluate her mental limitations and formulate a proper hypothetical to the VE. Because the Court finds that the ALJ erred in his failure to consider Dr. Qadir's evaluation, it declines to address Davis's

19

second argument.

Although the ALJ, at the close of the hearing, ordered a consultative examination to evaluate the severity of Davis's neck pain, (Tr. 25-26), it is clear from his decision that he did not consider that opinion when drafting his decision denying Davis disability benefits. For example, while Dr. Qadir's examination of Davis found mild atrophy and reduced muscle strength and reflexes in her upper left extremity, (Tr. 366-67), the ALJ, in evaluating Davis's condition against Listing 1.04A noted that "[t]he record, however, does not contain evidence indicating that the disorder is characterized by motor loss accompanied by sensory or reflex loss."[6] (Tr. 41). Further, while Dr. Qadir reviewed the MRI and specifically issued restrictions based on the severity Davis's cervical radiculopathy, (Tr. 373-77), the ALJ incorporated no restrictions into his RFC based on this condition, finding that "[t]he record does not contain any findings that clinically correlate the MRI scan of the cervical spine such that any functional limitations can properly be assessed due to chronic neck pain." (Tr. 45).

The Commissioner does not dispute that the ALJ failed to consider Dr. Qadir's consultative evaluation. However, she argues that this failure was, at most, harmless error because Davis failed to demonstrate that her cervical radiculopathy met the duration requirement by the date of the ALJ's decision. In support of this argument, the Commissioner cites the fact that the first treating record related to this condition was dated April 2011, only four months before the ALJ's decision in August of that year. (Tr. 355); 20 C.F.R. §§ 404.1505(a), 404.1509.[7] [13 at 19]. The Commissioner's argument is not well-taken

---

[6] 20 C.F.R. pt. 404, subpt. P, App. 1, Listing 1.04(A) defines "motor loss" as "atrophy with associated muscle weakness or muscle weakness".

[7] The Court notes that while the Commissioner points to the emergency room record as the first evidence of Davis's neck condition, the ALJ in his opinion apparently credited Davis's testimony

### 1.    The Duration Requirement

The Act's "duration requirement" is found in 20 C.F.R. §404.1509, and it provides, "Unless your impairment is expected to result in death, it must have lasted or be expected to last for a continuous period of at least 12 months. We call this the duration requirement." 20 C.F.R. § 404.1509. There are a few reasons why the Commissioner's argument that Davis failed to satisfy that requirement lacks merit. First, while the Commissioner argues that Davis did not meet the duration requirement for a disability based on the fact that her first objective treatment record for her neck pain was April 2011, the Court notes that the ALJ's disability decision was in no way based on Davis's failure to meet the duration requirement for her neck pain. Instead, the ALJ based his decision in part on the fact that Davis' neck condition did not meet or medically equal a listing and there was no objective medical evidence explaining the MRI findings such that functional limitations could be assessed. (Tr. 41; 45). The *post hoc* rationalization for the ALJ's conclusion is not an appropriate basis upon which to affirm his decision. *See Longmore v. Colvin*, No. 12-593, 2013 U.S. Dist. LEXIS 67718, *12-13 n.2 (D. Col. May 13, 2013) (rejecting Commissioner's *post hoc* argument that claimant's condition did not meet duration requirement where ALJ did not base his decision on that reasoning); *see also Hunter v. Astrue*, No. 1:09 CV 2790, 2011 U.S. Dist. LEXIS 148585, 2011 WL 6440762, at *4 (N.D. Ohio Dec. 20, 2011) (noting that "this court cannot engage in post-hoc rationalizations" citing *S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947)); *Schroeder v. Comm'r of Soc. Sec.*, No. 11-14778, 2013 U.S. Dist. LEXIS 45648, 2013 WL 1316748, at *13 (E.D. Mich. Mar. 1, 2013) (noting that "the Commissioner's post hoc rationalization is not an acceptable substitute for the ALJ's lack of rationale"); SSR 82-52 (requiring that "[a]ll cases denied on the basis of insufficient duration *must clearly state* [the

---

and her subjective reports of neck pain to her treating physician, as he found her condition originated "in late 2010." (Tr. 18; 45; 366; 382).

reasons] in the denial rational").

Second, the Commissioner's focus on Davis' April 2011 cervical radiculopathy as the starting point of the twelve-month duration window [13 at 19] ("[Davis] was not diagnosed with cervical radiculopathy until April 2011…The ALJ's decision was in August 2011, 4 months later…Plaintiff has not [shown that the 12-month duration requirement is met] because her impairment began only 4 months before the ALJ's decision.") is misplaced.  As noted above, *supra* fn. 7, the ALJ made a specific finding that Davis's condition began in "late 2010" (Tr. 45). *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 Fed. Appx. 488, 493 (6th Cir. 2011).[8]  While that adjustment to the starting point turns a purported four-month window into perhaps only an 8 or 9-month window, that fact is not dispositive here as the Commissioner's analysis is also flawed on the end point of the 12-month duration window.

As noted above, the applicable regulation requires that, in order to be considered disabled, a claimant's condition must "be expected to result in death or which has lasted or *can be expected to last* for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a) (emphasis added); *see also* § 404.1509.  Therefore, simply because the ALJ issued his decision less than twelve months before the designated commencement of Davis' condition does not automatically eliminate that condition from meeting the duration requirement.  Indeed, if evidence existed showing that the condition could be expected to continue for at least 12 months, it could be found to meet the duration requirement despite its onset date.  The Commissioner's

---

[8] In *Boulis-Gasche*, the ALJ had selected April 2005 as the starting point for the 12-month duration requirement analysis because it was in that month that the claimant's doctor had issued a prescription for the condition in issue.  The Sixth Circuit rejected the selection of that beginning date, finding that other evidence in the record suggested the claimant's condition began before that prescription was issued.  Although the earlier evidence in *Boulis-Gasche* was perhaps stronger than here, the Court cannot ignore the ALJ's specific finding that Davis' condition began in "late 2010."

interpretation, that the duration requirement must have already been met by the date of the ALJ's decision would render half of this regulation null.  Further, the Sixth Circuit, citing legislative history, has previously rejected the Commissioner's interpretation.  *See Owens v. Apfel*, 7 Fed. Appx. 408, 410 (6th Cir. 2011) (claimant was correct "that the benefits analysis is not dependent on when she went to see doctors about her condition, but rather is dependent upon how long the impairment was *expected* to last").

Here, Dr. Qadir specifically found that Davis would likely require surgery and that without it, her condition would prevent her from "using her left arm on a regular basis, lifting, bending, or doing any strenuous activity," (Tr. 367), a conclusion that is essentially equivalent to a finding that her condition could be expected to last at least until she had surgery.  Coupled with the ALJ's specific finding that Davis's condition began in "late 2010," (Tr. 45), his note that although she was "scheduled to undergo surgery" in July 2011, "as of the date of this decision, the record does not contain evidence of the same," (Tr. 44), and the evidence submitted to the Appeals Council that Davis did not have surgery for her condition until March 2012, (Tr. 381-83), there is at least an argument that the condition, even if fully alleviated by surgery (and there is no evidence before the Court that it was), would have lasted for at least 12 months.

Furthermore, there is at least a colorable argument that the ALJ implicitly found Davis's condition to have met the duration requirement.  In describing the five-step sequential analysis, the Regulations include the duration requirement within Step Two.  *See* 20 C.F.R. § 404.1520 ("At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe and meets the duration requirement [in § 404.1509], we will find that you are not disabled"); *see also Valentine v. Astrue*, No. 10-1234, 2011 U.S. Dist. LEXIS 68129,

*26 n.5 (N.D. Ill. June 24, 2011) ("A claimant can only move beyond step two by showing that he has an impairment that must have lasted or must be expected to last of a continuous period of at least 12 months") (citations omitted); *Duff v. Colvin*, No. 12-171, 2013 U.S. Dist. LEXIS 56157, *8 (E.D. Ky. Apr. 19, 2013) ("[a]n impairment is not severe if it does not meet the durational requirement").  Here, the ALJ found that Davis's "disorder of the cervical spine" was a severe condition at Step Two, (Tr. 40), and he proceeded to evaluate it against a listing at Step Three, and then discuss it in the context of his formulation of an RFC between Steps Three and Four.  (Tr. 41-45).  Because the ALJ did not specifically deny Davis's claim based on failure to meet the duration requirement, and because his progression through the sequential analysis lends itself to the conclusion that he implicitly found that Davis did meet that requirement, the Court cannot say that his failure to consider Dr. Qadir's opinion was harmless error.

As noted above, had the ALJ considered Dr. Qadir's opinion at Step Three, he may have found that the condition met or medically equaled Listing 1.04, as Dr. Qadir found what the ALJ himself noted was missing – motor loss accompanied by reflex loss.  (Tr. 41; 366-67).  Even if the ALJ would not have found that Davis met a listing, it seems likely that the functional limitations imposed by Dr. Qadir, including that Davis not lift more than 10 pounds frequently and 20 pounds occasionally, would have affected the ALJ's RFC assessment and his conclusion that Davis could return to her past work as a press operator, a medium exertion position (or perform any medium exertion work, for that matter).  (Tr. 45; 48; 367; 373-77); *see also* SSR 83-14 (medium exertional level occupations generally require the ability to lift up to 50 pounds, in addition to requiring frequent crouching and stooping).  The ALJ himself noted that his inability to assess functional limitations due to Davis's chronic neck pain was based on a lack of correlating medical evidence, which would likely have been supplied by Dr. Qadir's opinion,

24

since that was the very reason the ALJ had ordered the consultative examination in the first place.  (Tr. 25-26; 45) (noting that "I think it would be helpful . . .  to have a CE look at the MRI.").

For all of these reasons, the Court finds that the ALJ's failure to consider the consultative evaluation of Dr. Qadir was not harmless error and renders this Court unable to properly evaluate his ultimate conclusion.  Therefore, the Court finds that the ALJ's decision is not supported by substantial evidence of record.  The Court recommends that the ALJ's decision be remanded for consideration of Dr. Qadir's opinion in conjunction with the other record evidence, including Davis's post-decision surgical records, and any additional treatment or other records regarding Davis's conditions during the intervening time period that may bear on the ALJ's determination.

## III.   CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Davis's Motion for Summary Judgment **[11]** be **GRANTED**, the Commissioner's Motion **[13]** be **DENIED** and this case be **REMANDED** for further consideration in accordance with this Report and Recommendation.

Dated: August 26, 2013                          s/David R. Grand
Ann Arbor, Michigan                             DAVID R. GRAND
                                                United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail

to raise others with specificity, will not preserve all the objections a party might have to this

Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991);

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 26, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

26